**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES of AMERICA,** | : | **CRIMINAL ACTION** |
| **v.** | : | |
| **URIEL WILLIAMS,** | : | **25-CR-332-1** |

# MEMORANDUM

**KENNEY, J.** **August 31, 2026**

Presently pending before the Court is Defendant Uriel Williams' Motion to Suppress Statements. ECF No. 47. Specifically, Defendant moves to suppress statements made during his arrest, and during his post-arrest interview with law enforcement on May 7, 2025. ECF No. 47. The United States of America (the "Government") opposes relief. ECF No. 53. For the reasons that follow, the Court will **DENY** Defendant's Motion to Suppress (ECF No. 47).

## I. INTRODUCTION

Between August and October 2024, U.S. Customs and Boarder Protection ("CBP") worked together with the Pennsylvania Office of Attorney General to identify and investigate a suspected narcotics trafficking conspiracy. ECF No. 53 at 2.[1] The conspiracy involved the shipment of freight parcels from Los Angeles, California to Folcroft, Pennsylvania. *See id.* The parcels were believed to contain controlled substances. *Id.* Over the course of the investigation, law enforcement determined that Defendant was a member of the conspiracy. *Id.*

[1] Pagination corresponds to CM/ECF headers.

On May 7, 2025, law enforcement was made aware that a package (hereinafter, the "Package") was being mailed to 6835 Paschall Avenue in Philadelphia, Pennsylvania. *See id.* The Package originated from 6250 Santa Monica Boulevard in Los Angeles, California and was sent by a "Sheena Clark" to a "Claudia Scott" at 6835 Paschall Avenue, Philadelphia, Pennsylvania. *Id.* However, law enforcement suspected that "Claudia Scott" was an alias because they had identified the properly located at 6835 Paschall Avenue as a residence that was associated with "Brittany Daley," Defendant's paramour and the mother of his child. *Id.*

Law enforcement was alerted later that the Package may contain controlled substances when a canine, which was trained to alert for the presence of multiple controlled substances, was exposed to the Package and alerted. *Id.* at 3. Thereafter, law enforcement obtained a warrant to search the Package and discovered that it contained seventeen (17) vacuum sealed packages totaling approximately 8 kilograms of presumed crystal methamphetamine. *Id.* One of the sealed packages was field tested and tested positive for amphetamines/methamphetamine. *Id.*

After confirming that the Package contained controlled substances, officers re-filled the Package with "sham narcotics" and fitted the package with a light sensor that would alert law enforcement once the package was opened. *Id.* The same day, law enforcement identified a Black male standing on the street near the 6835 Paschall Avenue residence. *Id.* That individual was later identified as Defendant. *Id.* Then, law enforcement officers conducted a controlled delivery of the Package to 6835 Paschall Avenue in Philadelphia, Pennsylvania. *Id.* There, a Black female accepted the Package before walking it over to a parked Nissan Sentra and placing it in the trunk. *Id.* The Black female then got into the passenger seat and the Nissan Sentra departed the area. *Id.* Surveillance confirmed the driver to be Defendant. *Id.*

Law enforcement continued to surveil the Nissan Sentra as it drove away. *Id.* Eventually, law enforcement observed the Nissan Sentra pull over, at which time the Black female exited the vehicle and got into a nearby BMW. *Id.* Law enforcement continued to surveil the Nissan Sentra. *Id.* Law enforcement then watched as Defendant parked the vehicle, retrieved the Package from the trunk, and brought the Package to the passenger compartment. *Id.* Defendant then got back into the vehicle and continued to drive around before he eventually parked the Nissan Sentra, got out of the car with the Package, and walked the Package to a nearby wooded area. *Id.*

Once Defendant opened the package, the light sensor "activated," which alerted law enforcement that the Package had been opened. *Id.* At that point, law enforcement agents converged on Defendant. *Id.* Defendant attempted to flee but was ultimately apprehended and placed under arrest. *Id.* Defendant was then brought to the Pennsylvania State Police Belmont Barracks (hereinafter, the "Police Barracks") for processing, placed in handcuffs, and put inside an interview room where he was later interviewed by law enforcement. ECF No. 47 at 3, 7; ECF No. 53 at 4. Most of law enforcement's interactions with Defendant were recorded on body camera.[2] During the recorded part of his interview, Mr. Williams signed a document titled, "Statement of Rights" (the "Waiver"), or a waiver of his *Miranda* rights. ECF No. 47 at 3. The Waiver provides as follows:

[2] This footage has been provided to the Court and has been reviewed for the purpose of resolving Defendant's Motion. *Infra* Part IV(A).

**STATEMENT OF RIGHTS**

> Before we ask you any questions, it is my duty to advise you of your rights:
>
> You have the right to remain silent.
>
> Anything you say can be used against you in a court of law or other proceedings.
>
> You have the right to consult an attorney before making any statement or answering any questions.
>
> You have the right to have an attorney present with you during questioning.
>
> If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.
>
> If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.

**Waiver**

> I have read, or someone has read to me, this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without my lawyer present.

ECF No. 53-2 at 1. The Waiver bears Defendant's signature, as well as the signatures of two witnesses, and is dated May 7, 2025. *Id.*

During the interview, Defendant admitted to the officers that he knew there were narcotics in the Package recovered by law enforcement and admitted to other details of his criminal dealings. *See* ECF No. 53 at 3.

## II. BACKGROUND

On July 31, 2025, Defendant was indicted by a federal grand jury on a charge of attempted possession with intent to distribute 500 grams or more of methamphetamine in violation of 21

U.S.C. §§ 841(a)(1), (b)(1)(A), and 21 U.S.C. § 846 (Count One). ECF No. 15 at 1. Defendant has pleaded not guilty. ECF No. 20. Trial is currently scheduled for October 20, 2026. ECF No. 60.

Ahead of trial, Defendant has filed a Motion to Suppress Statements. ECF No. 47. Defendant has specifically moved to suppress (1) any statement made to law enforcement authorities during his arrest; and (2) any statement he gave post arrest to law enforcement on May 7, 2025. *Id.* The Government opposes the suppression of any of Defendant's statements. ECF No. 53. As part of its Opposition, the Government has included a video recording of Defendant's post-arrest interview. ECF No. 53-1 ("Exhibit A").

On June 3, 2026, the Court held a hearing (hereinafter, the "Suppression Hearing") on Defendant's Motion (ECF No. 47). ECF No. 55. At the hearing, the Government called Homeland Security Task Force Officer Shawn McClister ("Agent McClister") as a witness,[3] while the Defendant himself took the stand. ECF No. 55. Accordingly, the Motion will be decided based upon the Parties' briefing and upon the Court's findings of fact after hearing testimony from the Parties' witnesses.

## III. LEGAL STANDARD

The Fifth Amendment of the U.S. Constitution provides in relevant part that, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The Supreme Court has interpreted the Fifth Amendment's Self-Incrimination Clause to provide certain procedural safeguards for the accused while subject to a custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). This is because the accused's privilege against

[3] Agent McClister testified that though he is employed by the Pennsylvania Office of the Attorney General, he is "currently assigned to the Department of Homeland Security as a task force officer." ECF No. 62 ("June 3, 2026 Hr'g. Tr."), 7:18–8:02.

self-incrimination may be threatened any time a suspect is held in custody and subjected to questioning. *Id.* at 458 (finding "compulsion inherent in custodial surroundings"). Any "[a]ctual constitutional violations are handled under a single standard: they render both direct and derivative evidence inadmissible." *United States v. Curry*, 158 F.4th 153, 159 (3d Cir. 2025), *cert. denied*, No. CV 25-6567, 2026 WL 490825 (U.S. Feb. 23, 2026) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). This applies with full force to *direct* evidence collected as a result of a statement made in the absence of an effective *Miranda* warning. *See id.* (citing *United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001)). The Government carries the "heavy burden," *Tague v. Louisiana*, 444 U.S. 469, 470 (1980) (citation omitted), to prove "by a preponderance of the evidence" that the defendant did in fact waive his rights. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (citations omitted); *see also United States v. Lin*, 131 F. App'x 884, 886 (3d Cir. 2005) (citing *Lego v. Twomey*, 404 U.S. 477 (1972)).

## IV. DISCUSSION

Before the Court is Defendant's Motion to Suppress Statements. ECF No. 47. Defendant has moved to suppress (1) any statement he made to law enforcement authorities during his arrest; and (2) any statement he gave post arrest to law enforcement. *Id.* at 2–3. The Government opposes the suppression of any of Defendant's statements. ECF No. 53.

In addition to the Parties' briefing, the Court will rely upon both the body camera footage provided by the Government and the testimony elicited during the Suppression Hearing in resolving Defendant's Motion to Suppress (ECF No. 47). The body camera footage and the testimony elicited at the Suppression Hearing are considered below.

### A. Body Camera Footage from Post-Arrest Interview

In addition to the testimony elicited during the Suppression Hearing, the Government also submitted body camera footage (hereinafter, the "Video") of Defendant's post-arrest interview, which was conducted at the Police Barracks. ECF No. 53-1 ("Exhibit A"). The Video was later accepted into evidence during the Suppression Hearing. June 3, 2026 Hr'g Tr. at 16:25–17:06.

The Video begins at approximately 7:46 P.M. ECF No. 53-1 at 19:46:21. The man holding the camera proceeds to identify himself as "Agent Myers, [Department of] Homeland Security" and identify the other two law enforcement officials in the room as "Narcotics Agent McClister with attorney, Pennsylvania Attorney General's office, and Criminal Analyst Nicole Irvine." *Id.* at 19:46:22–19:46:36.

The video depicts Defendant sitting at a table across from Irvine and Agent Myers. *Id.* at 19:46:38. Defendant's left wrist is handcuffed to a side rail. *Id.* His right hand is in his pants pocket. *Id.* Agent Myers continues to address Defendant:

> **Agent Myers:** Alright, so, I know Agent McClister had already read your *Miranda* rights on the way over, you guys talked about that, so I just have, before I talk to you, I just have to verbally give them to you again. I just need you to sign off where you want to sign. If you don't want, just acknowledge that you understand what I read to you, [inaudible] what Agent McClister had already read, talked to you about, alright. So, I'll read this verbatim off it, and then just each one just give me a "yes" that you understand each one, or if you have any questions, you can ask questions, okay.

*Id.* at 19:46:45–19:47:11. At this point, Agent McClister interjects to confirm that Defendant reads, writes, and understands the English language.

> **Agent McClister:** Just, just before he goes through that, you read, write, and understand the English language, correct?
>
> **Defendant:** [Nods] Correct.

*Id.* at 19:47:11–19:47:16. Agent Myers then proceeds to advise Defendant of his rights.

**Agent Myers:** So, before we ask you any questions, it is my duty to advise you of your rights. You have the right to remain silent. Do you understand that?

**Defendant:** Mhm.

**Agent Myers:** Anything you kay [sic], say, can, can be used against you in a court of law or other proceedings. Do you understand that?

**Defendant:** [nodding] I do.

**Agent Myers:** You have the right to uh, consult an attorney before making any statement, or answering any questions. Do you understand that?

**Defendant**: [looking up at Agent Myers and nodding] I do.

**Agent Myers:** You have the right to an attorney to, to have an attorney present with you during questions, questioning. Do you understand that?

**Defendant:** [nodding] I do.

**Agent Myers:** If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish. Do you understand that?

**Defendant:** [Looking at Agent Myers and nodding] Mhm.

**Agent Myers:** If you decide to answer questions now, you, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney. Do you understand that?

**Defendant: [**Looking at Agent Myers and nodding] [inaudible]

*Id.* at 19:47:16–19:48:03.

When Agent Myers finished reading the Waiver, he asked Defendant to sign it. *Id.* at 19:48:08. After Defendant signed the Waiver, Agent Myers asked Defendant again if he wanted to speak with the officers:

**Agent Myers:** Do you wish to speak with us right now?

**Defendant:** Yeah.

**Agent Myers:** Okay.

*Id.* at 19:48:28–19:48:31. Throughout the post-arrest interview Defendant can be seen laughing and even joking with the law enforcement officers. *See, e.g.*, *id.* at 19:56:46, 19:57:29–19:57:35, 19:57:58, 20:02:45–20:02:49.

Later in the post-arrest interview, Defendant requested that the law enforcement officers stop the video recording. *Id.* at 20:06:49–20:06:51. The officers declined the request, explaining that the recording process was designed to ensure "transparency." *Id.* at 20:06:51–20:07:32. Defendant then asked the officers to speak "off the record." *Id.* at 20:07:37–20:07:43. Agents McClister and Myers then asked Defendant if he would like to "take a break." *Id.* at 20:08:27–20:08:32. Defendant nodded and confirmed that he wanted to take a break. *Id.* at 20:08:32. At this point, the interview concludes. *Id.*

**B. Credibility of the Witnesses**

Before turning to the merits of Defendant's Motion to Suppress (ECF No. 47), the Court must next address the credibility of the testimonial evidence offered by the Parties during the June 3, 2026 Suppression Hearing. At the Suppression Hearing, the Government put on one witness, Agent McClister. June 3, 2026 Hr'g. Tr. at 7:13–7:21. For the defense, Defendant himself took the stand to offer his account of the events that took place on May 7, 2025. *Id.* at 37:05–37:06.

**1. Agent McClister's Testimony**

Upon review of the testimony, the Court finds that the Government's witness, Agent McClister provided credible, clear, and consistent testimony about the events that took place. Agent McClister is an officer with the Pennsylvania Office of Attorney General and has been specially assigned to the Department of Homeland Security as a task force officer. June 3, 2026

Hr'g. Tr. at 7:25–8:04. Agent McClister was involved in the Government's investigation of Defendant from its inception until his ultimate arrest. *Id.* at 8:11–8:13. Accordingly, the Court credits Agent McClister's testimony regarding the series of events that took place leading up to, during, and after Defendant's arrest on May 7, 2025. Agent McClister testified to the following version of events:

Agent McClister testified that on May 7, 2025, his office became aware of the Package being delivered to the residence of the mother of Defendant's child at 6835 Paschall Avenue in Philadelphia, Pennsylvania. *Id.* at 8:14–8:22. Officer McClister and his fellow agents then observed Defendant come into possession of the Package. *Id.* at 8:24–9:05.

Once Defendant opened the package, the light sensor that it had been fitted with was activated. *Id.* at 9:06–9:11. At that point, law enforcement officers placed Defendant in handcuffs and walked him to a police vehicle. *Id.* at 20:15–21:08. After he was apprehended, law enforcement asked Defendant if he needed medical attention. *Id.* at 22:22–23:06. Agent McClister then walked Defendant back to a police vehicle parked near the wooded area. *Id.* at 22:01–22:11. Agent McClister first *Mirandized* Defendant and then asked Defendant if he was interested in cooperating with law enforcement and whether he was the ultimate recipient of the package. *Id.* at 10:25–11:15; 21:05–21:25; 23:13–23:25.

To *Mirandize* Defendant, Agent McClister pulled up an image of the *Miranda* rights on his phone and read them to Defendant verbatim. *Id.* at 12:11–12:15. Defendant verbally acknowledged that he had be read his *Miranda* rights. *Id.* at 12:21–12:24. Defendant did not provide law enforcement with a straight answer as to whether he was willing to cooperate, or whether there was another, final, recipient of the Package he needed to call. *Id.* at 23:23–24:07.

Agent McClister then drove Defendant to the Police Barracks. *Id.* at 13:04–13:10; 25:04–25:16. During the time it took to drive to the Police Barracks, Agent McClister did not have any further discussion with Defendant regarding the substantive facts of the case. *Id.* at 14:06–14:09; 25:13–25:18.[4]

Agent McClister then testified about Defendant's subsequent interview with law enforcement at the Police Barracks. Agent McClister testified to the same series of events that can be seen from the Video. That is, Agent McClister testified that during Defendant's interview with law enforcement at the Police Barracks, Agent Gregory Myers and HSI Intelligence Analyst Nicole Irvine were present in the room. *Id.* at 13:20–14:02. Agent McClister further testified that while in the room, Defendant's left arm was handcuffed to a side rail. *Id.* at 28:01–28:03; 31:01–31:10. Agent McClister was also shown portions of the Video while on the witness stand. *See, e.g.*, *id.* at 15:12–15:13; 15:23–15:24; 16:10–16:11. While not seen on the Video, Agent McClister testified that it was his voice that can be heard on the Video confirming that Defendant can read, write, and understand the English language. *See id.* at 30:04–30:14. When asked if the Video portrayed Defendant's subsequent interview with law enforcement accurately and completely, Agent McClister testified that the Video was an "accurate reflection of what occurred in the room during that portion of the Video on that date[.]" *Id.* at 16:21–16:24.

Therefore, the Court credits Agent McClister's testimony. Specifically, the Court credits Agent McClister's testimony that (1) after Defendant was arrested, he was placed in hand cuffs

[4] The Court notes that when pressed on cross-examination by Defense Counsel about whether he had *any* conversation with Defendant during the ride from the wooded area where Defendant was arrested to the Police Barracks, Agent McClister testified that he "[did]n't recall." *Id.* at 25:19–25:24. However, the Court notes that Defendant likewise has not identified what statements he may have made to Agent McClister during his arrest, or thereafter in Agent McClister's police vehicle. *Id.* at 18:03–18:13.

and brought to Agent McClister's police vehicle; (2) at that time, Agent McClister asked Defendant if he was willing to cooperate with law enforcement, and if so if there was another individual who was intended to be the ultimate recipient of the package; (3) prior to transporting Defendant to the Police Barracks, Agent McClister read Defendant his Miranda rights; (4) Agent McClister transported Defendant to the Police Barracks in his police vehicle; (5) once at the Police Barracks, Defendant was handcuffed in an interview room; and (6) Defendant was read his *Miranda* rights in the interview room before being questioned by law enforcement.

**2. Defendant's Testimony**

Upon review of the testimony, the Court finds that Defendant failed to provide credible, clear, or consistent testimony regarding whether he was read his *Miranda* rights by law enforcement. Defendant offered confused, contradictory testimony that was, at times, difficult for the Court to follow. Defendant's testimony was not only internally contradictory, but also contradicted what transpired on the Video after it was played for Defendant and the Court in the courtroom.

Specifically, Defendant testified on direct examination that Agent McClister read him his *Miranda* rights before Defendant was transported to the Police Barracks. June 3, 2026 Hr'g Tr. at 48:01–49:13. Defendant initially testified that Agent McClister did *not* read him his *Miranda* rights prior to the start of the Video. *Id*. at 48:20–48:23. Then, when asked if he remembered Agent McClister commenting in the Video that law enforcement had already read him his *Miranda* rights, Defendant said that he did. *Id.* 48:24–49:05. When asked when Agent McClister had read him his *Miranda* rights prior to start of the Video, Defendant stated that he believed Agent McClister had read him his *Miranda* rights when he walked into the interview room, but prior to

the start of the Video, approximately fifteen (15) minutes after he was placed in the interview room. *Id.* at 49:06–49:13; 49:19–49:22.

Then, however, Defendant testified that he could not recall whether Agent McClister, Agent Myers, or both agents had read him his *Miranda* rights. *Id.* at 69:16–69:22. Defendant proceeded to contradict his direct testimony. When asked whether Defendant previously confirmed with his attorney that Agent McClister had in fact read him his *Miranda* rights prior to the start of the Video, Defendant would not offer a straight answer. *See id.* at 70:09–70:12. Defendant's evasive answering continued when the Government confirmed that, per the Video that had been shown in the Courtroom mere minutes before, Agent Myers read Defendant his *Miranda* rights at the start of the interview. *See id.* at 71:11–71:23; 73:01. The Court had to intervene several times to instruct Defendant to answer the Government's question and to offer to show Defendant the Video again. *Id.* 72:20–72:21; 73:02–73:07.

Therefore, Defendant's testimony was contradictory at its best and evasive at its worst. The Court does not credit Defendant's testimony that he was not read his *Miranda* rights until Agent Myers read them to him at the start of the Video.

**C. Defendant's Motion to Suppress**

Defendant has moved to suppress statements made (1) to law enforcement authorities during his arrest; and (2) during the interview with law enforcement on May 7, 2025. ECF No. 47 at 3. The Government opposes the suppression of any of Defendant's statements. ECF No. 53. The Court will address each set of statements in turn.

As an initial matter, Defendant's Motion and supporting Memorandum of Law pertains almost entirely to statements made during Defendant's subsequent interview with law enforcement at the Police Barracks. ECF No. 47 at 7, 10. While Defendant submits that he is seeking to

suppress "any statement he made to law enforcement authorities during his arrest," Defendant only identifies one specific statement that he argues must be suppressed. *Id.* at 10. Defendant claims that he "incriminate[d] himself in admitting to knowing there were drugs inside the package." *Id.* Defendant argues that he was in custody at the time he made the statement and that despite signing a statement of rights, "no one verified he could read and underst[and] the form prior to his signing it." *Id.*

However, Defendant does not refer to any statement(s) that were allegedly made to law enforcement during his arrest; he only discusses the statement made during his subsequent interview with law enforcement. *See id.* Elsewhere in his Memorandum, Defendant refers to the fact that he was "in custody at the time of interrogation . . . with at least two (2) law enforcement officials inside of an official law enforcement building." *Id.* at 7. In its Opposition, the Government also exclusively discusses Defendant's statement to law enforcement during his subsequent interview at the Police Barracks. ECF No. 53 at 7–12.

To the extent that Defendant intended to move to suppress statements made during his arrest, he has not identified them. Accordingly, the Court will *briefly* address the nature of Defendant's custodial arrest and the brief conversation that took place between Agent McClister and Defendant prior to arriving at the Police Barracks. *Infra* Part IV(C)(1). The Court's analysis will otherwise focus on the inculpatory statement identified by the Parties and whether Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights prior to making the inculpatory statement to law enforcement. *Infra* Part IV(C)(2).

**1. Statements Defendant Made During His Arrest**

As discussed, *supra* Part IV(C), Defendant has not identified any inculpatory statements that he made to law enforcement during his arrest. So, the Court will only briefly touch upon

Defendant's interactions with law enforcement during his arrest, prior to his subsequent interview at the Police Barracks.

The Fifth Amendment provides in relevant part that, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. This is referred to as the "Self-Incrimination Clause." The Self-Incrimination Clause "permits a person to refuse to testify against himself at a criminal trial in which he is a defendant,'. . . and 'not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings[.]'" *Curry*, 158 F.4th at 158 (3d Cir. 2025) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984)).

The Supreme Court's seminal holding in *Miranda* has since "grafted onto the Self-Incrimination Clause 'a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation.'" *Id.* (quoting *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010)). Importantly, however, *Miranda* "sweeps far more broadly" than the Self-Incrimination Clause. *Oregon v. Elstad*, 470 U.S. 298, 306 (1985).

As the Supreme Court explained in *Elstad*, "[t]he Fifth Amendment prohibits use by the prosecution in its case in chief only of compelled testimony. Failure to administer *Miranda* warnings creates a *presumption* of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*." 470 U.S. at 306–07 (emphasis added). Only actual violations of the Fifth Amendment will trigger the Court's "doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed." *Id.* at 308.

Upon review, the Court will deny Defendants' Motion to Suppress with respect to statements that Defendant made to law enforcement *during* his arrest. To begin, the Court finds

that due to the nature of Agent McClister's questions to Defendant regarding his desire to cooperate and regarding the identities of any additional recipients of the Package, that the "prophylactic measures" of *Miranda* were triggered by Defendant's custodial interrogation. *See Alston v. Redman*, 34 F.3d 1237, 1244 (3d Cir. 1994) ("[T]he presence of *both* a custodial setting and official interrogation is required to trigger the *Miranda* right-to-counsel prophylactic, absent one or the other, *Miranda* is not implicated." (citations omitted)).

Here, it is clear that Defendant was "in custody" once he was arrested by federal agents and placed in handcuffs. *See United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006) ("A person is in custody when he either is arrested formally[,] or his freedom of movement is restricted to 'the degree associated with a formal arrest.'" (citing *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999))). Agent McClister testified at the Suppression Hearing that when Defendant was arrested, he was handcuffed while on the ground and then brought to Agent McClister's police vehicle to be transported to the Police Barracks for processing and a post-arrest interview. June 3, 2026 Hr'g Tr. at 20:15–21:04. Not only was Defendant formally "arrested," his freedom of movement was completely restricted. Accordingly, the Court finds that Defendant was in custody at the time of his arrest and during his transport to the Police Barracks.

Defendant was also subject to interrogation by Agent McClister after his arrest and prior to his transport to the Police Barracks. As relevant here, "interrogation" refers to "express questioning" and "any words or actions" that law enforcement officers "should know are reasonably likely to elicit an incriminating response from the suspect[,]" other than those usually attending arrest or custody. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). This analysis requires the Court to inquire into the "perceptions of the subject, rather than the intent of the police." *Id.*

Upon review, Defendant's interactions and brief conversation with Agent McClister fall under the definition of "interrogation" as laid out in *Miranda* and clarified in *Innis*. *Miranda*, 384 U.S. at 478–79; *Innis*, 446 U.S. at 301. At the Suppression Hearing, Agent McClister testified that once Defendant was walked back from the wooded area to Agent McClister's police vehicle, Defendant was asked about cooperation and whether there was anyone he needed to call, *i.e.*, another individual who might be expecting the Package. *Id*. at 21:22–21:25; 23:15–23:19. While, Defendant did not give Agent McClister a straight answer, *see id*. at 23:23–23:25, nonetheless, he was asked direct questions that Agent McClister should have known were likely to elicit an incriminating response. *See Innis*, 446 U.S. at 301.

In fact, the record before the Court reflects that Agent McClister *did* know that these questions were likely to elicit incriminating responses from Defendant. So, before asking Defendant any questions while he was in custody, Agent McClister read Defendant his *Miranda* rights verbatim from an image on his cellphone. June 3, 2026 Hr'g Tr. at 12:14–12:15.

As a prophylactic remedy, before subjecting any accused person to a custodial interrogation, *Miranda* requires that an officer first advise the accused of their constitutional rights: (1) to remain silent; (2) to appointed and present counsel; and (3) that any statements they make may to law enforcement may be used *against them* in court proceedings. *Miranda*, 384 U.S. at 478–79. While a rigid "incantation" of such a warning is not required, the warning must effectively convey to the accused what his rights are. *California v. Prysock*, 453 U.S. 355, 359–61 (1981).

As discussed above, *supra* Part IV(B)(1), the Court credits Agent McClister's testimony regarding the series of events that unfolded immediately after Defendant was arrested in the wooded area. Specifically, Agent McClister testified that he walked Defendant back to the police vehicle, *Mirandized* him, and then proceeded to ask about cooperation and the ultimate recipient

of the package. June 3, 2026 Hr'g Tr. at 21:22–22:25. Agent McClister testified that Defendant verbally acknowledged that he had received his *Miranda* warnings. *Id.* at 12:24. But as discussed, Defendant did not provide Agent McClister with a straight answer regarding cooperation. *Id.* at 23:23–23:25. Then, the conversation was over.

Finally, the Court will briefly address Defendant's testimony regarding his conversation with Agent McClister and other law enforcement at the scene of his arrest. While Defendant did not offer credible testimony regarding the series of events that unfolded after his arrest,[5] he did state numerous times that Agent McClister and other unidentified law enforcement officers told him that they had been "following him" for several years as part of an ongoing investigation.[6] The Court notes that even on Defendant's *own* version of events, these affirmative statements by the Officers do not trigger *Miranda*'s "prophylactic measures." The reason being, these statements are exactly that: statements. *See id.* at 56:21–57:11. They were not questions posed to Defendant to elicit an incriminating response. *See id.* at 57:07–57:11. Therefore, these statements were not made as part of an interrogation and thus did not obligate law enforcement to administer *Miranda* warnings. To be sure, Defendant did not testify that he responded to these statements. Instead, he confirmed that the officers were just "telling" him what they already knew about him from their investigation. *Id.* at 56:21–56:23.

---

[5] Defendant was later impeached by the Government when asked about previous, inconsistent statements he made earlier during his testimony. *See supra* Part IV(B)(2).

[6] Because Defendant has not described the statement(s) made during his arrest that he seeks to suppress, the Court is left guessing as to which pre-interview interaction with law enforcement gives rise to his Motion to Suppress. *See* ECF No. 47. For that reason, the Court consults Defendant's testimony for an indication of when he believes he was subject to interrogation and made inculpatory statements.

Later on, Defendant testified that Agent McClister allegedly asked him what was in the Package. *Id.* at 41:12–42:15. However, Defendant testified that he told Agent McClister and other law enforcement officers that he did not know what was in the Package. *Id.* Therefore, even on Defendant's version of events—that the Court has already deemed not credible—the statement would not be excluded under *Miranda* because it was not inculpatory. Further, even if the statement were deemed an involuntary, inculpatory statement in violation of *Miranda*, the statement itself would be "cumulative" of his later, admissible statement regarding the contents of the Package, which he made to law enforcement during his post-arrest interview at the Police Barracks. *See Blyden v. People of the V.I.*, 53 V.I. 637, 663–64 n.21 (D.V.I. 2010), *aff'd sub nom.*, *Virgin Islands v. Blyden*, 437 F. App'x 127 (3d Cir. 2011); *see also infra* Part IV(C)(2).

Accordingly, Defendants' Motion to Suppress Statements will be denied as to the statements he made to law enforcement during his arrest and during his transport to Police Barracks.

**2. Defendant's Statements During Post-Arrest Interview**

Next, Defendant seeks to suppress statements made after his arrest during an interview with law enforcement at the Police Barracks. ECF No. 47 at 2–3.

Broadly construed, Defendant argues that the inculpatory statement(s) he made during his arrest and later during his post-arrest interview with law enforcement must be suppressed because he did not effectively waive his *Miranda* rights prior to making the inculpatory statements. ECF No. 47 at 8–11. Defendant argues that although he signed the Waiver, law enforcement officials failed to confirm that he had read and understood the Waiver before signing it. *Id.* at 3, 10. Defendant further argues that he felt "coerced" into signing the Waiver due to conversations with law enforcement prior to his post-arrest interview. *Id.* at 3. The Government opposes, arguing

that Defendant was in fact properly advised of his *Miranda* rights prior to making any inculpatory statements. ECF No. 53 at 7–12. The Government further argues that Defendant fully understood his rights and nevertheless chose to waive them before later requesting that the interview conclude, thereby demonstrating his awareness of his rights by invoking them. *Id.*

*First*, the Parties do not dispute that Defendant was "in custody" while he was handcuffed in the interview room on May 7, 2025. ECF No. 53 at 7 n.1 ("The Government readily concedes that the defendant was under arrest and in custody at the time of the interview."). *Next*, the Court finds that Defendant was subject to an "interrogation" during his interview. As discussed, *supra* Part IV(C)(1), "interrogation" refers to express questioning as well as any words or actions that law enforcement officers "should know are reasonably likely to elicit an incriminating response," other than those *usually* attending arrest or custody. *Innis*, 446 U.S. at 301.

During the interview, Defendant was handcuffed and placed in an interview room with three law enforcement officers: Agent McClister, Agent Myers, and Analyst Irvine. Defendant was purposefully asked direct questions regarding his alleged criminal activity. The Court need not look far to determine that Defendant was being interrogated. Such is the intended purpose of a post-arrest *interview*. Further, the Parties do not dispute that during the interview, Defendant made at least one inculpatory statement that there were drugs in the Package. ECF No. 53 at 10.

Whether a statement is inculpatory depends on its "context." *Williamson v. United States*, 512 U.S. 594, 603 (1994). Where the statement goes to an element of the underlying charged offense(s), the statement is certainly incriminating. *See id.* Defendant is seen in the Video making the incriminating statement. ECF No. 53-1 at 19:59:09. However, the statement was made after Agent McClister confirmed that Defendant read, wrote, and could understand English. *See id.*

The statement was also made after Agent Myers read Defendant his statement of rights, or *Miranda* warnings.[7] *See id.* Finally, the statement was made after Defendant signed the Waiver. *See id.*

Accordingly, the Court finds that Defendant was adequately *Mirandized*. *See Miranda*, 384 U.S. at 479. Therefore, the issue left before the Court is whether Defendant's waiver was knowing, intelligent, and voluntary, such that his statement to law enforcement admitting that there were drugs in the Package—and the fruits of that statement—should not be excluded at trial. *See United States v. Jenkins*, No. CR 22-0028, 2023 WL 6295498, at *5 (D.V.I. Sept. 27, 2023) ("While a written waiver is "strong proof" of validity, "a writing is neither necessary nor sufficient to sustain the Government's burden . . . [.]" (collecting cases)).

As relevant here, a statement is not "compelled" within the meaning of the Fifth Amendment if an individual "voluntarily, knowingly and intelligently' waives his constitutional privilege." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Miranda*, 384 U.S. at 444); *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) ("[T]he accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived.'" (citation omitted)). A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Spring*, 479 U.S. at 573 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The Court must consider "the 'totality of the circumstances surrounding the interrogation'" to decide that the waiver is not "an uncoerced choice" and that Defendant had the "requisite level of comprehension[.]" *Id.* (citation omitted); *see also United States v. Jacobs*, 431

[7] The Parties have stipulated to the fact that Agent Myers read Defendant his *Miranda* warnings at the start of the interview, as seen in the Video. June 3, 2026 Hr'g Tr. at 34:23–35:16.

F.3d 99, 108 (3d Cir. 2005) (finding that "[a] statement is given voluntarily if, when viewed in the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker" (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973))).

In *Blackburn v. Alabama*, the court found that the defendant's confession was involuntary where the defendant, who was known to have suffered from severe mental illness, was subjected to eight to nine hours of interrogation, surrounded by officers and devoid of friends, family, and attorneys, and whose confession was written first by an officer. 361 U.S. 199, 205 (1960). The court in *Colorado v. Connelly* likewise suggests that involuntariness can be found where there is an exploitation of a known mental condition or physical pressure to elicit a waiver. 479 U.S. at 164, 170 (1986).

Upon review, the Government has provided ample evidence that Defendant received his *Miranda* warnings free of coercion from law enforcement. The Video shows Agent Myers read Defendant his *Miranda* rights before asking Defendant if he wanted to sign the Waiver. June 3, Hr'g Tr. at 19:47:16–19:48:08. There is no evidence that any psychological or physical tactic was used to exploit the Defendant or compel signature, as in *Blackburn* or suggested in *Connelly*. *Blackburn*, 361 U.S. at 205; *Connelly*, 479 U.S. at 164, 170.

Furthermore, the Court rejects Defendant's argument that he felt coerced into signing the Waiver due to his interactions with law enforcement before his post-arrest interview. To start, Defendant offered testimony that lacked credibility regarding what conversations he had with law enforcement during and immediately following his arrest. Defendant contradicted himself throughout his testimony, particularly with regard to differentiating between the events that occurred near the wooded area and his post-arrest interview. Agent McClister, however, offered clear, credible testimony that—apart from offering Defendant basic medical aid—he only asked

Defendant briefly about potential cooperating after Defendant had already been read and had verbally acknowledging his *Miranda* rights. The Court has already credited Agent McClister's testimony in determining that Defendant was properly *Mirandized* and that he did not make any inculpatory statements to law enforcement before his pre-arrest interview. The Court is unaware of any other credible evidence that Defendant was coerced into signing the Waiver by law enforcement. Therefore, the Court finds that Defendant's waiver was voluntary.

The Waiver was also knowing and intelligent. As relevant here, a waiver is knowing and intelligent if it has been "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Rought*, 11 F.4th 178, 187 (3d Cir. 2021) (quoting *Spring*, 479 U.S. at 573). However, the defendant does not need to understand *every* consequence of the waiver in order for the waiver to have been effective. *See Moran*, 475 U.S. at 422 (asserting that the Constitution does not "require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights" (collecting cases)).

Here, the Video shows that Defendant was read the Waiver by Agent Myers. ECF No. 53-1 at 19:47:16–19:48:03. Also on the Video, Agent McClister is heard briefly interrupting Agent Myers to confirm verbally that Defendant could "read, write, and understand the English language." *Id.* at 19:47:11–19:47:16. Defendant confirmed that he can. *Id.* When Agent Myers continues reading Defendant his *Miranda* rights, Defendant is seen nodding his head and verbally agreeing to his understanding of each right before signing the Waiver. *See id.* at 19:47:16–19:48:03. Further, the Court is satisfied that Defendant also understood the nature and consequence of the waiver. *See Tague*, 444 U.S. at 471. Defendant asked Agent Myers to stop the video recording and later successfully requested the questioning to cease. *Id.* at 20:06:49–

20:08:32. Therefore, Defendant exercised his rights later in the post-arrest interview, which demonstrated both that he understood his rights and that he successfully invoked them.

Accordingly, the Court finds that under the totality of the circumstances, Defendant's waiver of his *Miranda* rights was knowing, intelligent, and voluntary. Defendant's Motion to Suppress Statements will be denied with regard to his statements made during his post-arrest interview at the Police Barracks.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Statements (ECF No. 47) is **DENIED** in full. An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**