**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **URIEL WILLIAMS** | : | **No. 25-CR-332-1** |
| | : | |

**MEMORANDUM**

**KENNEY, J.** **September 10, 2026**

Presently before the Court are Defendant's Motions to Suppress Cell Phone Data (ECF No. 48) and Cell Phones Contents (ECF No. 58). The Government opposes both Motions. ECF Nos. 52, 64. For the reasons that follow, Defendant's Motions to Suppress Cell Phone Data (ECF No. 48) and Cell Phones Contents (ECF No. 58) will both be **DENIED** in full.

## I. INTRODUCTION

On May 7, 2025, Defendant was arrested and charged with one count of possession with intent to distribute 500 grams or more of crystal methamphetamine and one count of attempted possession with intent to distribute. ECF No. 48 at 2. Later, a federal grand jury returned an indictment against Defendant charging him with one count of attempted possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846. *Id*. at 2; ECF No. 15 at 1. A jury trial is scheduled. ECF No. 60 at 2.

In anticipation of trial, Defendant has moved to suppress both cell phone data, including prospective cell site location information, and the contents of two cell phones obtained by law enforcement through the execution of two separate search and/or seizure warrants. ECF Nos. 48, 58. The Government opposes relief as to both Motions. ECF Nos. 52, 64. The Parties have not

filed reply briefs. Accordingly, the Motions (ECF Nos. 48, 58) are fully briefed and will be considered on the basis of the submissions without oral argument(s) or evidentiary hearing(s).[1]

## II. BACKGROUND

### A. The November 2024 Warrant for Cell Phone Data

On November 14, 2024, the Pennsylvania Attorney General's Office submitted an application (the "November Application") for the "Disclosure of Mobile Communications Tracking Information and/or Installation and Use of a Pen Register/Trap and Trace Device and Telecommunication Identification Interception Device" on a cell phone number used by Defendant,[2] to the Honorable Anne Marie Coyle of the Philadelphia Court of Common Pleas. ECF No. 48-1 at 1, 6; ECF No. 48 at 3. In support of the Application, the Attorney General's Office submitted the Affidavit of Agent Shawn McClister ("Agent McClister's Affidavit" or the "Affidavit"). ECF No. 48-1 at 6–24.

#### 1. Agent McClister's Affidavit in Support of the November Application

##### i. Agent McClister's Training and Experience

In the Affidavit, Agent McClister makes conclusions based on his experience and training as a law enforcement officer with extensive experience conducting drug interdiction efforts. *See id.* ¶¶ 1–4. Agent McClister has been employed as a Narcotics Agent with the Pennsylvania Office of the Attorney General, Bureau of Narcotics Investigation and Drug Control since 2021. *Id.* ¶¶ 1–2. In addition to his Task Force experience, Agent McClister is a sworn Philadelphia County Detective with the Philadelphia District Attorney's Office and has worked as a police officer in

[1] Defendant's arguments in favor of suppression are "four-corner arguments," or limited to the contents of the search and/or seizure warrants. *See* ECF No. 48 at 6 n.2. Accordingly, the Court did not conduct a suppression hearing in connection with either Motion.

[2] The November Application references cell phone number: (859) 468-6305. ECF No. 48-1 at 1, 6.

the Commonwealth of Pennsylvania for over ten years. *Id.* ¶¶ 1–2. Agent McClister graduated from the Montgomery County Municipal Police Academy and has attended specialized drug and interdiction trainings.[3] *Id.* ¶ 3.

At the time, Agent McClister was assigned to the Liberty Mid-Atlantic High Intensity Drug Trafficking Area Regional Freight and Parcel Interdiction Task Force and the Department of Homeland Security Investigations, Philadelphia Airport Border Enforcement Security Team. *Id.* ¶ 1. As a Task Force Agent, Agent McClister's "primary responsibility" was to conduct parcel, freight, airport, and train drug interdiction(s). *Id.* As part of these efforts, Agent McClister has worked undercover, conducted wiretaps, and made controlled purchases of controlled substances, including cocaine, heroin, fentanyl, and marijuana. *Id.* ¶ 2. Over the span of his career, Agent McClister has made hundreds of arrests in connection with violations of both federal and state drug laws. *Id.*

**ii. Agent McClister's Knowledge of Illegal Trafficking of Controlled Substances**

In the Affidavit, Agent McClister provided a summary of his knowledge and observations of drug traffickers, including their means or methods. *See id.* ¶¶ A–L. Agent McClister summarized in relevant part, that drug traffickers typically utilize "different modes of transportation in order to transport illegal narcotics from source states to their destination." *Id.* ¶ F. Traffickers use vehicles with hidden compartments as well as parcels, airplanes, buses, trains, and tractor trailers to transport "large quantities" of narcotics. *Id.* To ship these illegal controlled

[3] Agent McClister's trainings include: the EPIC/DEA Jet Way Interdiction Program; the Pennsylvania State Police Top Gun Undercover Drug Course; Interview and Interrogation in Narcotics Cases; Airport Narcotics Investigations; Identifying and Seizing Electronic Evidence; and High Intensity Drug Trafficking Area Residential and Vehicle Concealments. ECF No. 48-1 ¶ 3.

substances and contraband, traffickers commonly use "Commercial Mail Receiving Agencies." *Id.* ¶ G. Individuals will "purchase," or order, narcotics from another individual to "avoid common Law Enforcement practices of interdicting these shipments via roadways, trafficways, and other means of mass transportation[.]" *Id.*

Agent McClister is also familiar with the ways that drug traffickers often use their cell phones and/or smart phones to evade law enforcement and facilitate their drug trafficking organization(s). *Id.* ¶¶ H–I, K–L. Traffickers use cell phones to store telephone numbers, addresses, and photographs (of associates in the drug trafficking organization and/or their product). *Id.* ¶¶ H–I. Traffickers also specifically use their cell phones to "make it more difficult for Law Enforcement to identify and/or intercept their conversations[,]" by using text messages and other "apps" on their cell phones to "facilitate their drug trafficking." *Id.* ¶ K. As part of these efforts to evade detection, drug traffickers may also use cell phones that are subscribed to in another person's name.[4] *Id.* ¶ L.

**iii. Agent McClister's Conclusions Supporting Probable Cause**

In 2024, Agent McClister was involved in a drug trafficking investigation targeting three suspects: Robin Moore ("Target 1"), Defendant Uriel Williams ("Target 2"), and Kadian McDonald ("Target 3"). *Id.* ¶¶ 6–8.[5]

Between August and October 2024, agents working for the Pennsylvania Office of the Attorney General Liberty Mid-Atlantic High Intensity Drug Trafficking Area Regional Freight

[4] In addition to traditional cell phones, Agent McClister has learned that drug traffickers will sometimes use prepaid cellular telephone services that do not require any subscriber information to establish an account. ECF No. 48-1 ¶ L.

[5] Paragraph number 7 is erroneously followed by paragraph 6. For clarity, the Court cites paragraph 8 as if it were correctly numbered.

and Parcel Interdiction Task Force working alongside U.S. Customs and Border Protection Officers, conducted interdiction efforts at Forward Air, a commercial parcel receiving agency in Folcroft, Pennsylvania. *Id.* ¶¶ 7–8. Law enforcement noted a package shipped from a "Box and Ship" located in Los Angeles, California that had been sent to Forward Air, but that was addressed to a "C & L Auto Repair" at the same address. *Id.* ¶ 8. Agent McClister then conducted a query with Forward Air Corporate to search for past shipments from the same Box and Ship in Los Angeles to "C & L Auto Repair." *Id.* ¶ 9. Forward Air Corporate responded that there had been fourteen (14) similar shipments made since January 1, 2024, with four (4) shipments taking place since August 1, 2024. *Id*. In addition to these fourteen (14) shipments, a law enforcement source located another shipment sent from the same Box and Ship in Los Angeles to an address in Sterling, Virginia. *Id.* ¶ 10. A search of that freight parcel confirmed that it contained high quantities of illegal controlled substances.[6] *Id.* Later, in October, law enforcement located and searched another freight parcel that was sent from the same Box and Ship in Los Angeles; that freight parcel was also confirmed to contain high quantities of illegal controlled substances.[7] *Id.* ¶ 11.

Law enforcement was then able to connect the shipment of that freight parcel to a male suspect—referred to in Agent McClister's Affidavit as "Target 1"—who had called about and attempted to pick up the freight parcel in question at Forward Air. *Id.* ¶ 12. Target 1 is believed

---

[6] Law enforcement recovered three (3) kilograms of fentanyl pills, twelve (12) kilograms of cocaine, and twenty-nine (29) pounds of marijuana. ECF No. 48-1 ¶ 10.

[7] Law enforcement found two (2) kilograms of cocaine, two (2) pounds of crystal methamphetamine, approximately nine and one half (9.5) gallons of suspected "PCP," and approximately twenty (20) pounds of marijuana. ECF No. 48-1 ¶ 11. The suspected cocaine, methamphetamines, and marijuana each field tested positive. *Id.*

to have been spotted on location at Forward Air driving a white "U-Haul" van. *Id.* ¶ 13. Target 1 was then seen departing, without taking possession of the freight parcel.[8] *Id.*

Later in October, law enforcement served a sealed Pennsylvania State Search Warrant on U-Haul for its records. *Id.* ¶ 14. After searching through Target 1's U-Haul rental records, agents found that Target 1 had provided the same cell phone number on rental paperwork on seven (7) occasions since May 22, 2024. *Id.* These rentals each took place "in close proximity to the arrival of" similar freight parcels at Forward Air. *Id.* ¶ 15.

Agent McClister then reviewed video surveillance footage from another U-Haul location on Chestnut Street in Philadelphia. *Id.* ¶ 17. On the surveillance footage, Agent McClister observed Target 1 accompanied by Target 2 (Defendant).[9] *Id.* ¶ 17. Target 1 and Target 2 arrived

---

[8] Agent McClister believed that Target 1 observed uniformed U.S. Customs and Border Protection Agents on location at Forward Air and departed. ECF No. 48-1 ¶ 13.

[9] Target 2—Defendant Uriel Williams—was already known to Agent McClister from a 2022 interdiction effort. ECF No. 48-1 ¶¶ 22–23. In the Affidavit, Agent McClister described an interdiction effort that took place at the Philadelphia International Airport on January 21, 2022. *Id.* ¶ 22. Agent McClister, together with Homeland Security Investigations and the Pennsylvania State Police, received a tip from a confidential source regarding two passengers on a flight from Philadelphia, Pennsylvania to Los Angeles, California. *Id.* Law enforcement reviewed the flight itinerary information and learned that Target 2 (Defendant) and Target 3 bought one-way tickets that day. *Id.* At the airport, Agent McClister and other officers had "consensual encounters" with the Targets. *Id.* Agent McClister encountered Defendant, who gave "implausible and contradictory stories about [his] relationship" with Target 3 as well as "their travels." *Id.*

Both Target 2 and Target 3 consented to a search of their luggage during these encounters. *Id.* Law enforcement recovered approximately $96,000.00 from Target 2 and Target 3. *Id.* The currency showed high levels of drug residue on it. *Id.* Both men provided law enforcement with more "implausible and contradictory stories" regarding the currency law enforcement found in their luggage. *Id.*

Defendant was using a Florida driver's license. *Id.* ¶ 23. The agents ran a search on law enforcement databases for Defendant's name. *Id.* ¶ 22. Defendant's name returned information confirming that he sent wire transfers in August and November 2022 to places such as Mexico, California, Jamaica, and Kansas using the cell phone number (859) 468-6305. *Id.* Agent

at the U-Haul location together. *Id.* The men were then seen renting the same U-Haul van that was used to attempt to pick up the freight parcel at Forward Air. *Id.* ¶ 18.

In November, Agent McClister spoke to a U-Haul employee, who stated that another rental reservation had been scheduled on October 22, 2024 by "someone related to this investigation[.]" *Id.* ¶ 19. After law enforcement did another sweep of U-Haul's records, Agents learned that a cell phone number previously associated with Target 2 (Defendant) had been used to rent a U-Haul in October. *Id.* ¶ 19. The cell phone number, which was now used by Target 1 to sign the rental agreement, was accompanied by a New York State driver's license with Target 2's (Defendant's) picture. *Id.* Though the license featured a clear picture of Defendant, the license bore the fictitious name "Andre Smith." *Id.* U-Haul rental records from July 22, 2024 showed another van rental made by "Andre Smith" using the same driver's license that coincided with the arrival of another suspected drug trafficking package at Forward Air that had been shipped from the same Box and Ship. *Id.* ¶¶ 20–21. Agent McClister subsequently confirmed that "Andre Smith" does not live at the address listed on the driver's license or have the birthday listed on the driver's license. *Id.* ¶ 19. The identification was fraudulent. *See id.*

On this basis, Agent McClister concluded that there was "probable cause to believe that Target 2 and others known and unknown have committed and are committing offenses involving Corrupt Organizations, . . . Criminal Conspiracy, . . . violations of the Controlled Substance, Drug, Device and Cosmetic Act, . . . and Forgery," and that "[t]here is probable cause to believe that Verizon wireless cellular telephone number (859) 468-6305 utilized by Target 2 will continue to be used by Target 2 and others as yet unknown in connection with the forgoing illegal acts." *Id.*

---

McClister determined Target 2's and Target 3's unusual activity indicated drug trafficking activity. *Id.*

¶¶ 5(a)–(c); 24–25. Agent McClister believed that the seizure and search of Target 2's (Defendant's) "information gathered from the operation of the pen register, trap and trace device, telecommunication identification interception device and disclosure of mobile communications tracking information will be relevant to an ongoing criminal investigation[.]" *Id.* ¶ 26. This information was sought on the basis that it would lead to the discovery of evidence of Defendant's illegal drug trafficking activities, including "identifying any and all co-conspirators" and "the location of the target(s) and/or controlled substances along with other locations he provided this forged/fraudulent identification." *Id.* ¶¶ 26–30.

The November Application (hereinafter, the "November 2024 Warrant") was accepted and executed the same day. Defendant now challenges the sufficiency of the November 2024 Warrant and seeks suppression of the cell phone data, (hereinafter, "Cell Phone Data")—and fruits thereof—recovered by law enforcement. ECF No. 48.

**B. The May 2025 Warrant for Cell Phones Contents**

Thereafter, in May 2025 the Government submitted another application in support of a search warrant (the "May Application"). ECF No. 58-1. The May Application sought to search the contents of two cell phones: (1) a gray Apple iPhone with broken front and back glass; and (2) a blue in color Blu Products Inc., model J8L with phone number (213) 646-5940. *Id.* ¶ 6. The May Application also sought to seize evidence of Defendant's alleged crimes contained on the devices, specifically in violation of 21 U.S.C. §§ 841(b)(1)(A)(viii) and 846. *Id.*

**1. Agent Myers' Affidavit in Support of the May Application**

In May 2025, Department of Homeland Security Investigations Special Agent Gregory Myers submitted an affidavit in support of the May Application ("Agent Myers' Affidavit" or the "Affidavit"). *See id.* Agent Myers swore and affirmed the following facts in support of his

conclusion(s) that there was probable cause to believe that Defendant's two cell phones were used in the commission of illegal drug trafficking and that a search of the phones' contents would reveal evidence of Defendant's illegal drug trafficking. *See id.* ¶ 51.

**i. Agent Myers' Training and Experience**

Agent Myers has training, experience, and personal knowledge of "the manner" and means of illegal drug trafficking. *See id* ¶ 4. Agent Myers has a bachelor's degree from Rowan University in "law and justice." *Id.* ¶ 2. Agent Myers has also worked as a police officer for approximately four (4) years and, at the time of Defendant's arrest, had been employed as a Special Agent with the Department of Homeland Security Investigations for two (2) years. *Id.* At the time, Agent Myers was assigned to the Philadelphia International Airport Homeland Security Investigations Port Investigations Border Enforcement Security Task Force. *Id.* As part of that assignment, Agent Myers specialized in investigating violations of federal laws "relating to the movement of people, goods, and financial instruments." *Id.* From his experience, Agent Myers is familiar with how controlled substances are manufactured, sold, distributed, and used, as well as the "prices, slang terminology, codes, and mechanisms used in association with the distribution and use of illicit narcotics." *Id.* ¶ 4. Agent Myers is also familiar with the ways that narcotics traffickers "disguise" their conversations about their efforts to traffic illegal controlled substances. *Id.*

**ii. Agent Myers' Conclusions Supporting Probable Cause**

In the Affidavit, Agent Myers affirms or swears to the following set of facts: On May 7, 2025, agents from the Pennsylvania Office of the Attorney General Bureau of Narcotics and Drug Control and the Department of Homeland Security Investigations conducted interdiction efforts at a commercial parcel facility located within the Eastern District of Pennsylvania. *Id.* ¶ 7. Law

enforcement observed a package (the "Package") that had been sent from a "Sheena Clark" located in Los Angeles, California to a "Claudia Scott" located at "6836 Paschall Avenue, Philadelphia, Pennsylvania" (the "Paschall Avenue Address"). *Id.* ¶ 8. Law enforcement had already associated the Paschall Avenue Address with Defendant through another investigation and were aware that Defendant had recently returned to Philadelphia from Los Angeles. *Id.* ¶¶ 8–9.

Through their investigation, law enforcement had also already linked "at least one other parcel containing controlled substances" to Defendant. *Id.* ¶ 10. That is, law enforcement intercepted a parcel in October 2024 that had been sent to Forward Air, listing "Robin Moore" as the recipient.[10] *Id.* When a canine from the Pennsylvania Office of the Attorney General trained to alert for controlled substances conducted an "open-air sniff" of the parcel, the canine alerted for the presence of "a controlled dangerous substance." *Id.* After law enforcement searched the parcel, it was confirmed that it contained controlled substances.[11] *Id.*

So, when law enforcement got ahold of the Package headed for the Paschall Avenue Address, they exposed it to a drug-trained canine from the Philadelphia Sheriff's Department.[12]

---

[10] Robin Moore is also the known name of Target 1 described by Agent McClister in his Affidavit in support of the November 2024 Warrant. ECF No. 48-1 ¶¶ 6–8. The May Application similarly describes Moore attempting to collect the freight parcel on location at Forward Air in a U-Haul Van on October 7, 2024. ECF No. 58-1 ¶ 10. Law enforcement later confirmed that the U-Haul had been rented from the Chestnut Street, Philadelphia U-Haul location by viewing surveillance video footage showing Moore and Defendant at the Chestnut Street U-Haul location paying for the U-Haul rental. *Id.* Moore and Defendant arrived at the U-Haul location in a BMW X6 (associated with Target 3 from the November 2024 Warrant). *Id.*

[11] After executing a state search and seizure warrant for the parcel, Agent McClister recovered approximately nine (9) kilograms of marijuana, two (2) kilograms of cocaine, one (1) kilogram of methamphetamine, and approximately nine and one half (9.5) gallons of liquid PCP. ECF No. 58-1 ¶ 10.

[12] The canine, Max, has received over 400 training hours, is certified by the Philadelphia Police Department, and receives at least eight (8) hours of maintenance training every month. ECF No.

*Id.* ¶ 11. When exposed to the Package, the canine alerted, or "indicated" that there was a "trained odor" of illegal controlled substances emanating from the Package. *Id.* U.S. Magistrate Judge Pamela A. Carlos issued a federal search warrant to search the Package for drugs. *Id.* ¶ 12. A search of the Package revealed seventeen (17) packages of *presumed*, and later field tested positive for, crystal methamphetamine. *Id.* In total, there was approximately eight (8) kilograms of crystal meth in the Package. *Id.* That day, Magistrate Judge Carlos also issued a search warrant to search the premises at the Paschall Avenue Address. *Id.* ¶ 13.

Law enforcement had observed Williams outside of the Paschall Avenue Address using his cell phone. *Id.* ¶¶ 14–15. Then, dressed as a FedEx delivery driver, an undercover agent delivered the Package to the Paschall Avenue Address at which time an individual, described by Agent Myers as a Black female accepted the Package, stating "I have been waiting for this all day." *Id.* ¶ 16. The Black female then placed the Package in the trunk of a Nissan Sentra, got into the car, with a male identified as Defendant, and departed the area. *Id.*

Defendant then drove the Nissan Sentra with the Black female in the passenger seat several blocks away. *Id.* ¶ 17. The Black female then got out of the Nissan Sentra, got into another car that was parked nearby, and drove away. *Id.* Law enforcement then observed Defendant drive the Nissan Sentra to several locations while law enforcement followed him. *Id.* ¶ 19. Each time, Defendant stopped, each time without exiting the vehicle. *Id.* In Agent Myers' experience, this is a common practice used by drug traffickers to ensure they are not being followed by law enforcement. *Id.*

---

58-1 ¶ 11. Max is specifically trained to alert or "indicate" for the following narcotics: methamphetamine, crack, heroin, fentanyl, marijuana, MDMA, and cocaine. *Id.*

Eventually, Defendant drove the Nissan Sentra down Thomas Avenue between Cobbs Creek Parkway and South 58th Street in Philadelphia. *Id.* ¶ 20. Defendant then got out of the vehicle, took the Package out of the trunk, placed the Package in the passenger compartment, and left the area on foot. *Id.* When he returned, Defendant got into the driver's seat and drove the Nissan Sentra toward Cobb's Creek Parkway, turning the car down an alleyway. *Id.* Defendant then got out of the car again and walked the Package to a wooded area located at the intersection of 59th Street and Fernwood Station. *Id.*

Once Defendant walked the Package to the wooded area, he attempted to open it. *Id.* ¶ 21. However, the Package had been fitted with a light sensor that immediately alerted law enforcement agents, who converged on Defendant. *Id.* Defendant attempted to flee from the wooded area, leaving the Package behind. *Id.* As he was fleeing, a Pennsylvania State Trooper observed Defendant take a cell phone from his person and throw it directly onto the pavement. *Id.* ¶ 22. Agent Myers believes, in his experience, that Defendant was intentionally trying to destroy his cell phone on the pavement to prevent law enforcement from accessing its contents. *Id.*

Defendant was subsequently taken into custody. *Id.* ¶ 23. The cell phone that Defendant threw onto the pavement was recovered, as well as a second cell phone that was located inside of the Nissan Sentra. *Id.* ¶¶ 24–25. The second cell phone had a white label on the back of the phone with the phone number associated with the device. *Id.* ¶ 25. Agent Myers believes that the cell phone was labeled this way to distinguish it because multiple people may have been using the phone. *Id.* ¶ 26.

On this basis, Agent Myers determined that there was probable cause to believe that the "SUBJECT DEVICES," or Defendant's cell phones, were used in the commission of crimes, including violations of Title 21 U.S.C. §§ 841(b)(1)(A)(viii) and 846. *Id.* ¶ 51. The May

Application (hereinafter the "May 2025 Warrant") was accepted by U.S. Magistrate Judge Craig M. Straw on May 14, 2025. *Id.* at 18. Defendant now challenges the sufficiency of the May 2025 Warrant and seeks suppression of the contents of both of the cell phones recovered by law enforcement. ECF No. 58.

## III. LEGAL STANDARD

The Fourth Amendment ensures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "[F]or a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (citing *Katz v. United States*, 389 U.S. 347, 356–57 (1967)); *see also United States v. Williams*, 813 F. Supp. 3d 503, 513 (E.D. Pa. 2025) ("Generally, police cannot search or seize individuals, or their property, without a warrant 'supported by Oath or affirmation, and particularly describing the place to the searched, and the persons or things to be seized.'" (citing U.S. CONST. amend. IV)). Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Yusuf*, 461 F.3d 374, 390 (3d Cir. 2006) (explaining "[t]hat determination [of probable cause] does not require absolute certainty that evidence of criminal activity will be found at a particular place, but rather that it is reasonable to assume that a search will uncover such evidence." (citations omitted)); *cf. United States v. Conley*, 4 F.3d 1200, 1204 (3d Cir. 1993) ("Probable cause determinations are necessarily fact-intensive[.]").

As relevant here, where the search and/or seizure is executed pursuant to a warrant that was issued by a judge, "the duty of a reviewing court is simply to ensure that the magistrate [or state court judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed."

*Illinois*, 462 U.S. at 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *see also Conley*, 4 F.3d at 1205 (concluding that, like the Court of Appeals, "the district court exercise[s] only a deferential review of the *initial* probable cause determination made by the magistrate" (citing *Illinois*, 462 U.S. at 236)); *see also Williams*, 813 F. Supp. 3d at 524 ("A Court reviewing a warrant's validity should examine the facts before the magistrate judge at the time and determine whether there was a substantial basis for finding probable cause to issue the warrant." (citing *Jones*, 994 F.2d at 1054)). But this deferential review must not reduce the function of the reviewing court to that of a "rubber stamp." *See id.* (quoting *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir. 1983)). But "[e]ven if" the Court determines that "a warrant is devoid of probable cause, such a violation 'does not always guarantee suppression of evidence derived from an illegal search.'" *United States v. Cain*, 795 F. Supp. 3d 645, 654 (E.D. Pa. 2025) (quoting *United States v. Caesar*, 2 F.4th 160, 167 (3d Cir. 2021)). That is, suppression is not the immediate conclusion, it is the "last resort." *See United States v. Rosario*, 180 F.4th 512, 522 & n.12 (3d Cir. 2026) ("Suppression 'has always been our last resort, not our first impulse.'" (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006))).

## IV. <u>DISCUSSION</u>

Defendant has moved to suppress both the Cell Phone Data (ECF No. 48) and the contents of two cell phones (ECF No. 58) that were seized by law enforcement. The Government opposes both Motions. ECF Nos. 52, 64. The Court addresses Defendant's Motions to Suppress in turn.

### A. Defendant's Motion to Suppress Cell Phone Data

Defendant has moved to suppress Cell Phone Data, including prospective cell site location information ("CSLI") that was obtained pursuant to the November 2024 Warrant issued by the Honorable Anne Marie Coyle of the Philadelphia Court of Common Pleas. ECF No. 48. In support

of his Motion to Suppress Cell Phone Data, Defendant argues that the November 2024 Warrant is facially defective. ECF No. 48 at 7–14. Specifically, Defendant argues that the November 2024 Warrant is defective because it: (1) lacks probable cause; (2) lacks particularly; and (3) is overbroad. *Id.* at 8. In opposition, the Government argues that the November 2024 Warrant is (1) supported by probable cause; (2) sufficiently particular; and (3) not overly broad. ECF No. 52 at 10–20.[13]

**1. The November 2024 Warrant Is Supported by Probable Cause**

*First*, Defendant argues that the November 2024 Warrant lacks probable cause. ECF No. 48 at 8–11. Defendant argues that the November 2024 Warrant lacks probable cause because Agent McClister's Affidavit fails to establish the requisite connection between the recovered illegal substances and Defendant's Cell Phone Data. *Id.* Defendant argues that the Affidavit states that drug traffickers *generally* use cell phones and does not contain details about how he was using his cell phone to commit the suspected crime(s). *Id.* In opposition, the Government first points out that Defendant has relied upon case law dealing with a search of the *contents* of a cell phone, not CSLI. ECF No. 52 at 12. The Government nonetheless addresses the special nature of search warrants for Cell Phone Data that include prospective CSLI. *Id.* at 13–16. The Government argues that because Agent McClister's Affidavit indicated that Defendant's Cell Phone Data is likely to reveal the location of ongoing criminal activity, there is a sufficient nexus between the suspected drug trafficking and the Cell Phone Data. *Id.* at 15. The Government further argues that even

[13] The Government further argues that, even if the Court finds that the Warrant lacks probable cause, law enforcement nonetheless should be afforded the good faith exception, as they acted in good faith in relying upon judicially approved warrants. ECF No. 52 at 20–24. Defendant does not engage with the "good faith exception" in his briefing. *See* ECF No. 48. Nor has Defendant filed a reply brief to address the Government's arguments. However, for the reasons discussed *infra*, the Court need not address the "good faith exception" to the Warrant requirement because the Court does not find that the Warrant lacks probable cause or the requisite particularity.

under a more stringent standard applied in other Circuits, the Affidavit sufficiently ties the underlying suspected drug trafficking to Defendant's cell phone and its location history. *Id.* at 15–16. The Government points to specific details about how Defendant used his cell phone to fill out U-Haul rental paperwork and to send wire transfers in connection with the suspected criminal activity. *Id.*

Generally, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995)). This standard strikes an important balance, by "provid[ing] individuals protection 'against unreasonable searches and seizures,' . . . , while simultaneously enabling investigating officers to act quickly—before necessarily obtaining evidence sufficient to prove guilt beyond a reasonable doubt—to effect an arrest." *Id.*

As the Government's arguments preview, Defendant's Cell Phone *Data* includes his CSLI. This information can be used to track the Defendant's location at varying frequencies. In *Carpenter v. United States*, the United States Supreme Court held that there is a reasonable expectation of privacy over one's CSLI due to the "deeply revealing nature of CSLI, its depth, breadth, and comprehensive reach, and the inescapable and automatic nature of its collection[.]" 585 U.S. 296, 320 (2018). Accordingly, "the Government must generally obtain a warrant supported by probable cause before acquiring such records." *Id.* at 316. But in *Carpenter*, the Supreme Court was only analyzing what is known as "historical," or past CSLI, as opposed to "prospective," or forward looking CSLI. *See id.*

The November 2024 Warrant extends to prospective CSLI. ECF No. 48-1 ¶ 6. As this Court has previously determined in this context, "the traditional nexus between the place to be searched and the items to be seized arguably breaks down in the cell phone context[.]" *United States v. Rashwan*, 684 F. Supp. 3d 347, 355 (E.D. Pa. 2023) (citation omitted). As the Court determined in *Rashwan*, whether the Government has established probable cause in the cell phone context may be defined as "a fair probability that the phone's data will aid in a *particular* investigation and disclose evidence of criminal activity, or, more stringently," defined as a "a fair probability that the phone itself is being used in connection with criminal activity[.]" *Id.* (quoting *United States v. Sheckles*, 996 F.3d 330, 338 (6th Cir. 2021)).

Measured under either standard explored in *Rashwan*, *id.* at 355–57, and mindful of the Court's limited review of a warrant approved of by a magistrate judge, *United States v. Smith*, 720 F. Supp. 3d 384, 387 (W.D. Pa. 2024), the Court is satisfied that Judge Coyle correctly determined that the November 2024 Warrant was supported by probable cause. Here, Agent McClister described how Defendant used his cell phone on numerous occasions to send wire transfers. ECF No. 48-1 ¶ 22. Agent McClister also specifically described how a cell phone number associated with Defendant was used to rent several of the U-Hauls near Forward Air where the intercepted freight parcels were shipped. *Supra* Part II(A). Therefore, the Court finds that the November 2024 Warrant was supported by probable cause. Accordingly, Defendant's Motion to Suppress Cell Phone Data (ECF No. 48) is denied on this basis.

**2. The November 2024 Warrant Is Sufficiently Particular**

*Next*, Defendant argues that the November 2024 Warrant is an "unconstitutional general warrant" because it lacks the requisite particularity and constitutes a "generalized fishing expedition." ECF No. 48 at 11–13. Defendant argues that because the November 2024 Warrant

sought CSLI, the November 2024 Warrant "seeks to essentially delve into every aspect of [his] life, including his locations in real time[,]" highlighting the sensitive nature of the information at issue. *Id.* at 13. Defendant argues that, at a minimum, the November 2024 Warrant fails to establish a sufficient nexus to justify *all* the Cell Phone Data that it sought. *Id.* In opposition, the Government argues that the November 2024 Warrant does not constitute a general warrant. ECF No. 52 at 16–19. The Government argues that under the required flexible approach for determining particularity, the November 2024 Warrant sets forth the requisite: (1) specific offense for which law enforcement established probable cause; (2) described the place to be searched; and (3) specified the items to be seized by their relationship to Defendant's suspected criminal activity. *Id.* at 17.

Specifically, the Government argues that Agent McClister's Affidavit sets forth sufficient factual details in support of a sixty (60) day request for prospective CSLI to obtain relevant location information to uncover more of Defendant's drug trafficking activities. *Id.* In addressing the intimate nature of Defendant's Cell Phone Data, the Government concedes that accessing Defendant's Cell Phone Data—including his CSLI—"inevitably results in the collection of information related to areas where an individual would normally have an expectation of privacy," but argues that the search warrant was nonetheless constitutional and that suppression should be denied. *Id.* at 18. The Government points to courts within the Third Circuit that have upheld post-*Carpenter* search warrants for CSLI, supporting the notion that there is no *per se* ban on CSLI. *Id.* at 19.

As discussed, Defendant's Cell Phone Data—inclusive of his prospective CSLI—is treated with a high level of sensitivity in the context of the Fourth Amendment. *Carpenter*, 585 U.S. at 320. That is, "[w]arrants must 'particularly describ[e] the place to be searched, and the persons or

things to be seized.'" *United States v. Jackson*, No. 23-1615, 2024 WL 2874364, at *3 (3d Cir. June 7, 2024) (quoting U.S. CONST. amend. IV). The purpose of the particularity requirement is "to: (1) provide written assurance that the magistrate judge actually found probable cause to search for, and to seize, every item mentioned, and (2) prevent general searches by confining the discretion of officers and authorizing them to seize only particular items." *Id.* (cleaned up).

Even considering the context of the prospective CSLI, the Court is satisfied that the November 2024 Warrant is sufficiently particular. The November 2024 Warrant sets forth: (1) the cell phone number associated with the desired Cell Phone Data; (2) specifies the Cell Phone Data requested; (3) specifies the period of historical/prospective data requested; (4) and describes the items "to be seized" relative to their relationship to the suspected underlying drug trafficking organization. ECF No. 48-1 at 1–24. Further, the Affidavit describes how Defendant's cell phone number was connected to several wire transfers and to U-Haul rentals made contemporaneously with the arrival of freight parcels to Forward Air. *Supra* Part II(A). So, the November 2024 Warrant was based on the fact that Defendant's cell phone was linked to the location, means, and proceeds of the suspected drug trafficking organization. *See id.*

Therefore, the Court finds that the November 2024 Warrant is sufficiently particular. Accordingly, Defendant's Motion to Suppress Cell Phone Data (ECF No. 48) is denied on this basis.

**3. The November 2024 Warrant Is Not Overly Broad**

*Finally*, Defendant argues that the November 2024 Warrant is overly broad. ECF No. 48 at 13–14. Here, Defendant's argument builds upon his same arguments that the November 2024 Warrant lacks particularity. *See id.* Defendant argues here that the Court must compare "the scope

of the search and seizure authorized by the warrant and the ambit of probable cause established by the supporting affidavit." *Id.* (citation omitted).

The Court has already found that each of the requests to seize Defendant's Cell Phone Data contained in the November 2024 Warrant are supported by probable cause. *Supra* Part IV(A)(2). For the same reasons, the Court must reject Defendant's argument that the November 2024 Warrant is overly broad. Thus, Defendant's Motion to Suppress Cell Phone Data (ECF No. 48) is also denied on this basis. Accordingly, Defendant's Motion to Suppress Cell Phone Data (ECF No. 48) is denied in full.

**B. Defendant's Motion to Suppress Cell Phones Contents**

Defendant has also moved to suppress the contents of two cell phones that were seized and searched by law enforcement upon the execution of the May 2025 Warrant. ECF No. 58. Like the November 2024 Warrant, Defendant argues that the May 2025 Warrant is "fundamentally constitutionally defec[tive][.]" *Id.* at 3. Defendant makes the same three arguments in favor of suppression: Defendant argues that the May 2025 Warrant (1) lacks probable cause; (2) lacks particularity; and (3) is overbroad. *Id.*

**1. The May 2025 Warrant Is Supported by Probable Cause**

*First*, Defendant argues that the May 2025 Warrant lacks probable cause to search his cell phones and seize their contents because the May 2025 Warrant does not identify a nexus between the identified cell phones/contents and his suspected criminal activity. ECF No. 58 at 7–10. Defendant points to places in Agent Myers' Affidavit where Agent Myers offers only "generalized" conclusions about "common practices of drug traffickers." *Id.* at 8–9. In opposition, the Government argues that the May 2025 Warrant is supported by "ample probable cause[.]" ECF No. 64 at 9. Specifically, the Government contends that Agent Myers' Affidavit provided specific

factual affirmations regarding how Defendant's cell phones were used during his suspected criminal activity.[14] *Id.* at 9–13. Furthermore, the Government points out that the May 2025 Warrant was approved by a "neutral federal magistrate judge court, and . . . was relied upon and executed by the investigating agents in good faith." *Id.* at 9–10.

As previously discussed regarding Defendant's Motion to Suppress Cell Phone Data (ECF No. 48), "the traditional nexus between the place to be searched and the items to be seized arguably breaks down in the cell phone context[.]" *Rashwan*, 684 F. Supp. 3d at 355 (citations omitted). While the contents inside of an individual's cell phone do not necessarily implicate one's privacy interests the same way the CSLI may, a warrant for the contents of an individual's cell phone must still be supported by probable cause. *See id.* at 355 (describing the more lenient standard under which probable cause exists if there is "a fair probability that the phone's data will aid in a *particular* investigation and disclose evidence of criminal activity," and the more stringent standard, under which probable cause is found where there is "a fair probability that the phone itself is being used in connection with criminal activity[.]" *Id.* (quoting *Sheckles*, 996 F.3d at 338).

The May 2025 Warrant was accepted by U.S. Magistrate Judge Craig M. Straw, who found that there was probable cause to believe that Defendant was using his cell phones to further the

[14] The Government addresses Defendant's contentions that (1) Agent Myers' Affidavit lacks any evidence that he was involved in criminal activity; and (2) that there are no indicia that evidence of the crime could be found on his phone. ECF No. 64 at 11–12. The Government responds *first* that Agent Myers specifically described that Defendant picked up the Package, transported it to the wooded area, opened the Package, and then fled from law enforcement when they attempted to arrest him. *Id.* at 11. The Government responds *second* that Agent Myers also described that Defendant was "observed outside the SUBJECT PREMISES waiting for the delivery of the SUBJECT PARCEL and using a cellular phone." *Id.* (citation omitted). Agent Myers also described his knowledge and observations of how drug trafficking organization members utilize cell phones. *Id.* at 11–12. Agent Myers then explained how Defendant had not only been found with "Cell Phone 1" on the scene of his arrest on May 7, 2025, but also how other evidence confirmed that "Cell Phone 2" had contacted the Paschall Avenue Address five (5) times on the day of the delivery of the Package. *Id.*

particular criminal activity described above. Accordingly, the Court's review of the sufficiency of Agent Myers' Affidavit is limited. The Court is satisfied that Magistrate Judge Straw, considering Agent Myers' Affidavit inclusive of his relative training and experience, determined that there was probable cause to believe that the contents of Defendant's cell phones—recovered at the scene of his arrest, and used to call the house where the Package was delivered to—would lead to reliable information about the suspected drug trafficking organization. *See, e.g.*, *Smith*, 720 F. Supp. 3d at 387 (explaining that "[m]agistrate judges (or state court judges) reviewing search warrant applications regularly defer to the assessments of experienced law enforcement officers on matters within their competence, and reviewing courts . . . must defer to their credibility determinations" (citation omitted)). Therefore, the May 2025 Warrant is supported by probable cause. Accordingly, Defendant's Motion to Suppress Cell Phones Contents (ECF No. 58) is denied on this basis.[15]

**2. The May 2025 Warrant Is Sufficiently Particular**

*Next*, Defendant argues that the May 2025 Warrant lacks particularity. ECF No. 58 at 10–12. Here, Defendant argues that the May 2025 Warrant constituted a "generalized fishing expedition[.]" *Id.* at 12. Defendant takes issue with the fact that the May 2025 Warrant does not specify the specific content(s) of his cell phones that were believed to contain or lead to relevant information about Defendant's supposed drug trafficking. *Id.* Defendant again highlights the sensitive nature of the contents of an individual's cell phone(s) and questions the ability of law enforcement to encroach on such a private aspect of his life without identifying the specific information within his cell phones they wished to access. *See id.* In opposition, the Government

[15] As the Court has found that the May 2025 Warrant was supported by probable cause and is sufficiently particular, the Court need not address the Government's arguments regarding law enforcement's "good faith" in relying on the May 2025 Warrant. *See* ECF No. 64 at 16–20.

argues that the May 2025 Warrant sets forth the requisite: (1) offense for which law enforcement has established probable cause; (2) the places to be searched; and (3) the relationship of the items to be seized to the underlying crime. ECF No. 64 at 14–15.

As discussed, warrants must be sufficiently particular. *Jackson*, 2024 WL 2874364, at *3 (quoting U.S. CONST. amend. IV.). Here, the May 2025 Warrant easily satisfies the particularity requirements. The May 2025 Warrant clearly states that: (1) Defendant is suspected of having violated 21 U.S.C. §§ 841(b)(1)(A)(iii) and 846, and that "evidence of these violations will be found on the information stored on the SUBJECT DEVICES identified in Attachment[] A[;]"(2) that it is specifically "the electronic files of and memory of the SUBJECT DEVICES," or Defendant's cell phones, that are the subject of the requested search; and (3) explains that "the electronic files and memory of the SUBJECT DEVICES will yield evidence of violations of the federal laws, including, but not limited to, disclosing the identities of persons involved in the commission of these offenses, as well as the existence and scope of the conspiracy" and "[e]vidence of calls made by, to, and among the members of this conspiracy[.]"[16] ECF No. 58-1 ¶¶ 49, 51.

Therefore, the Court is satisfied that the May 2025 Warrant is sufficiently particular. Accordingly, Defendant's Motion to Suppress Cell Phones Contents (ECF No. 58) is denied on this basis.

[16] In Attachment A, the "SUBJECT DEVICES" are specifically identified as "1. Gray Apple iPhone with broken front and back glass (SUBJECT DEVICE 1)" and "2. Blue in color Blu Products Inc. – Model J8L – with a white label on the back of the phone with phone number (213) 646 5940 written on the label (SUBJECT DEVICE 2)[.]" ECF No. 58-1 at 19 ("Attachment A"). Attachment B contains a detailed list of the exact information, or contents that were sought from the "SUBJECT DEVICES," or cell phones, named in the May 2025 Warrant. *See id.* at 20–21 ("Attachment B").

### 3. The May 2025 Warrant Is Not Overly Broad

*Finally*, Defendant argues that the May 2025 Warrant is overly broad. ECF No. 58 at 13. This argument builds upon Defendant's previous argument that the May 2025 Warrant did not specify with the requisite *particularity* what specific content(s) on his two cell phones law enforcement wished to access. *Id.* Here, Defendant argues that the May 2025 Warrant provides unfettered access to his cell phone contents—inclusive of information and items "as to which there is no probable cause." *Id.* (citation omitted). The Government disagrees.[17] ECF No. 64 at 15–16.

For the same reasons that the Court has determined the May 2025 Warrant is sufficiently particular, discussed *supra* Part IV(B)(2), the Court rejects Defendant's argument that the May 2025 Warrant was *overbroad*. Thus, Defendant's Motion to Suppress Cell Phones Contents (ECF No. 58) is also denied on this basis. Accordingly, Defendant's Motion to Suppress Cell Phones Contents (ECF No. 58) is also denied in full.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motions to Suppress Cell Phone Data (ECF No. 48) is **DENIED** in full. Defendant's Motion to Suppress Cell Phones Contents (ECF No. 58) is also **DENIED** in full. An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**

[17] The Government addresses Defendant's overbreadth argument: the Government argues that Defendant "has not provided any factual or legal support that the [May 2025 Warrant] was overbroad above the general legal standard for overbreadth." ECF No. 64 at 16. The Government argues that because there is probable cause "supporting a sufficient nexus" between the cell phones and Defendant's suspected drug trafficking activity, the May 2025 Warrant is not "overbroad." *See id.*